INTERNATIONAL & GREAT NORTHERN RAILROAD COMPANY ET AL. V. A. W. TEMPLE.

Decided June 18, 1910.

**Personal Injuries—Evidence—Accident.**

In a suit by a railroad freight brakeman for damages for personal injuries caused by falling between two of the cars when they were uncoupled and separated as he was in the act of stepping from one to the other, evidence

considered and held insufficient to show negligence on the part of the defendant's employees contributing to the plaintiff's injuries, but that said injuries were chargeable to the dangers and risks incident to the service in which he was engaged, and hence the defendant was not liable.

Appeal from the District Court of Anderson County. Tried below before Hon. B. H. Gardner.

*King & Morris,* for appellants.

*Thos. B. Greenwood* and *A. G. Greenwood,* for appellee.—That the evidence was sufficient to show negligence on the part of defendant, cited: Batts' Texas Civ. Stats., art. 4560-ea; St. Louis S. W. Ry. Co. of Texas v. Pope, 43 Texas Civ. App., 616; Galveston, H. & S. A. Ry. Co. v. Mitchell, 48 Texas Civ. App., 381; Galveston, H. & S. A. Ry. Co. v. Henefy, 115 S. W., 57-60; Texas & N. O. Ry. Co. v. Walker, 58 Texas Civ. App., ——; Gulf, C. & S. F. Ry. Co. v. Cooper, 33 Texas Civ. App., 319; Texas Central Ry. Co. v. Pelfrey, 35 Texas Civ. App., 501; Texas & Ft. S. Ry. Co. v. Anderson, 111 S. W., 175; Ft. Worth Belt Ry. Co. v. Johnson, 59 Texas Civ. App., 105; San Antonio & A. P. Ry. Co. v. Hodges, 102 Texas, 524; Texas & P. Ry. Co. v. Cotts, 95 S. W., 603; Gulf, B. & K. C. Ry. Co. v. Harrison, 104 S. W., 401; Missouri, K. & T. Ry. Co. v. Baker, 58 S. W., 965; Gulf, C. & S. F. Ry. Co. v. Howard, 97 Texas, 519.

PLEASANTS, CHIEF JUSTICE.—This suit was brought by the appellee against the appellant railroad company and T. J. Freeman, receiver of said company, to recover damages for personal injuries sustained by appellee on September 23, 1907, while in the employment of said company and which it is alleged were caused by the negligence of a fellow employee engaged with appellee in operating a train on said railroad.

The defendant railroad company answered by general demurrer and general denial, and plea of assumed risk and contributory negligence.

The defendant, Freeman, answered by general demurrer and several special exceptions, and by general denial and pleas of assumed risk and contributory negligence.

The trial in the court below with a jury resulted in a verdict and judgment in favor of the plaintiff against the defendant railroad company in the sum of $25,000.

The undisputed evidence adduced on the trial establishes the following facts: Appellee at the time of his injury was in the employment of appellant railroad as a brakeman on a local freight train, and in pursuance of the duties of his employment was engaged in switching or placing cars in the railroad yard at Jacksonville. The train upon which appellee was brakeman had come into the yard and begun switching operations a short time before appellee was injured. The crew of this train, who were engaged with appellee in doing this switching, were, beside the engineer and fireman, a swing brakeman, named Melville, and a head brakeman, named McWhorter. Appellee was the

rear or field brakeman. Switching is done by local freight trains in accordance with a "switching list" which is a card showing the switching to be done and is prepared by the station agent. This list is given the swing brakeman and he has full control and directs the movements of trains in placing or switching the cars as indicated by the switching list before mentioned. The swing brakeman is practically foreman of the crew. The head brakeman follows the engine and throws the switches and repeats signals from the swing brakeman to the engineer. The rear brakeman's place is at the rear end of the train and when switching is being done he follows the car or cars that are cut off from the train and places them by setting the brakes or blocking them.

There were a number of tracks in this yard, besides the main track, which were designated by numbers and also by special uses to which they are put, such as the "house track" and the "Cotton Belt" track, the former being the track upon which cars were placed to receive or discharge local freight, and the latter being the track on which cars destined to points on the Cotton Belt Railroad were placed.

When appellee's train arrived in the yard the swing brakeman, Melville, procured the switching list, and while examining it, appellee walked up behind him and asked what the list looked like. Melville replied: "We have a little switching to do down on the south end of the house track. Those three coal cars on No. 15 we want to drop them in on the Cotton Belt track when we get through down there, when we get through doing the house track switching down there."

Following this statement the crew went in on track No. 15 and picked up eight or ten cars, including the three coal cars, and then kicked one car on the main line, and blocked it there.

By this time another freight train, bound south, pulled into the yards and stopped about twelve feet north of the car just blocked on the main line. The swing brakeman then directed appellee to go to the conductor of this freight train and tell him not to move the car on the main line, but that as soon as the crew got through with the work on the house track they would have to drop in three coal cars on the north transfer of the Cotton Belt, and that he would get the car out of the way as soon as he did that. This message was delivered by appellee, and he returned to his crew at work on the house track. Several moves were then made in completing the switching on the house track. The last move was to kick in four or five cars on the extreme south end of this track. The last work done there by appellee was to set some brakes on top of some of these cars. Just as appellee got down from this work his train came back up the main line with a cut of six or eight cars attached to the engine. The engine was at the south end of the train and was backing along the main line toward the north. At the north end of the train was a box car, and next to that was a stock car, and next to the stock car came the coal cars, to which reference is made above. When the train came back by appellee after he set the brakes on the cars he had just placed on the house track, it was his duty to catch the train and go to his place on the rear end to be ready to take charge of the next car or cars that might be cut loose. The box car and the stock car before mentioned at the north end of the train passed appellee before he could catch them, but he caught on the

north end of the next car, which was one of the coal cars, and passed over to the stock car, the top of which he reached by a ladder at its south end. When he got on top of this car he hurried along to reach the car at the end of the train so that he could set the brakes there when it was cut loose. Just as he reached the end of the stock car and was in the act of stepping from the one car to the other, the box car was cut loose and the speed of the train suddenly slacked, causing the two cars to separate, and appellee fell between the cars and received the injuries of which he complains.

Dave Melville, witness for defendant, testified that he had been in the train service since 1874 constantly. That he went to work for the International & Great Northern Railroad Company the 10th of October, 1896. That he was brakeman on train No. 42, north bound, on September 23, 1907, at which time Temple was injured. That they were switching in the yards at Jacksonville at the time that accident occurred. Their train was the first to reach Jacksonville and was doing the switching while the south bound local freight train was waiting for it. That some cars that he had thrown in on the house track rolled back and he had to go back and spot them again. That Temple got up to set the brakes—he got up on top of the cars, and they (Melville and the rest of the crew) came back down on the main line. All of the switching had been done except the cars that they wanted for the Cotton Belt transfer track and those going to the T. & N. O. were about all that they had. That they came down the house track and intended to go on track 15. That they had a car to kick in on that track. That they got out of the house track by pulling south on the main line and then went north up the main line to track No. 15. That when they started north he got on the side of the second car from the north end, intending to set one car on No. 15 track. That they got to going fast enough to cut it off, and he gave the engineer a signal to stop. About that time he saw Mr. Temple falling, and he gave what is called a "wash out signal" to stop. That after the train stopped he put a chunk under the car (that had been cut loose) and had the engine to back up and then he shoved the car off by hand. When they started north up the main line on the run when Temple was hurt, he got on the side of the car he had designated about seven or eight cars south of the point where Temple was hurt. He (Melville) was riding on the same car from which Temple fell—the car next to the end car. He was on the north end of that car, the car being moved north, in order to pull the pin and cut off the end car. He was riding there to keep from having to run. He cut off the end car by pulling the pin. He then gave the engineer an ordinary stop signal, which was obeyed just as any other signal by making an ordinary stop. While he was riding on the side of that car Temple was back of him somewhere—he didn't know where he was. He saw him when he passed him. That he didn't know whether he was standing on the ground when he passed him or climbing down the cars that had been kicked in on the other track or setting the brakes on them. He believed Temple was about four or five cars back of him when he pulled the pin. That he didn't know where he was when he gave the stop signal. That his idea was to follow up the car and take care of it himself. That it was not his duty

to know where Temple was. That if Temple was not there to take care of the cars he (Melville) was supposed to take care of them. That it was not his duty to climb up on the cars and look for Temple. The hind man has to look after him (Melville, the swing brakeman). That he did not tell the head man that he was going to cut off the car and put it in there. That it was not his duty when he throws a car into a side track to verbally and personally notify any of the brakemen. That it is the duty of the brakemen to take notice of the signals and to watch the signals. That he did not think that he told Temple anything about where any particular car or cars would be placed at any particular place. Not that he knew of did he tell Temple that he had three cars for the Cotton Belt transfer. They had been on track 15 before the time that Temple was hurt, and pulled out those cars to be set on the house track, and had left that switch open when they pulled out. The switch was already open when they went back and Temple fell. It was at the entrance to track 15 where Temple fell.

On cross-examination the witness said Temple was expected to know what was going on and what was to be done, and was expected to look out for himself. That he doesn't believe he gave him any directions of any kind with reference to the work that Temple was assuming to do at the time he was hurt. The switch list directed that two cars in that string should be transferred to the Cotton Belt. It didn't matter when he did that. He had his own way about when it was done. He was on the side of one of the cars of that string when Temple was hurt. He pulled the pin to cut off the end car when it got to where he wanted to separate it from the car next to it. That he did not give Temple a thought at the time he uncoupled those cars. That the last time he saw him he thought he was too far back to make an attempt to catch that car, and gave him no further thought. That he does not know that he took any particular observation of this occasion to see whether Temple had caught those cars just one car length behind him. It was not necessary for him to take any, and he doesn't know that he did. That he did not know it was necessary for him to try to take any observation to see if Temple was coming across those cars just at the time he pulled the pin. That it is the duty of the brakeman to look out for this and it is not his (Melville's) business. That he did not think Temple was there, and he did not think it was necessary to look out for him to see if he was there and he did not do so. That when he saw him where he was when he observed him last, he did not think Temple could catch, and was going to attend to that car himself. That he did not give him any notice at all, that he (Melville) was going to uncouple these cars; he thought Temple must certainly have seen him cut off that car when he made the run for it. That he gave Temple absolutely no notice that he was going to cut it off, nor did he try to give him any notice. That he did not give anybody any notice before he pulled the pin. Anybody would know that would be the consequences of pulling the pin to a man about to step from one car to another.

R. W. McWhorter, witness for defendant, testified that he was a member of the same train crew with Temple at the time he was hurt. That he was head brakeman on that train, and was following the en-

gine in the switching they were doing there. "After the train backed out of the house track on to the main line, before it went north, a signal to go ahead was passed to me and I repeated it to the engineer. The engineer then started north, and Melville gave a kick signal, to kick a car into track 15, I suppose. When I repeated that signal the engineer increased speed to kick that car in. Melville caught the cars and Temple also caught between me and Melville. Temple was standing then between Melville and me. I could not say for certain whether there was anyone with him. When I saw him he caught the cars between me and Melville. He got up on top and started towards the head end of the train that was going in on track 15, and which Melville intended to cut off. When I last saw him he was about a car length from Melville, back towards me, still running towards the head end. When Melville cut the car off he gave a stop signal by sticking out his hand, which meant that he had cut off that end car. Then I saw him give a violent stop signal, which we call a "washout signal." When Melville got on the train he was standing between the house track and the north Cotton Belt transfer about five or six or seven car lengths from where Temple fell. While Melville was hanging on the side of the car Temple was going over the top of the cars towards that end. When Temple caught on the train, Melville had already caught and was hanging on the side of the second car from the end. That position indicated that he was going to cut off the end car. From having worked with him and knowing how he worked I knew when he gave that signal that he was going to cut off the end car. He was at the proper place to make that cut.

"It is the duty of the man handling the switch list to cut off the cars. It was not my duty to do that. Temple had no right under the rules and customs of that work to suppose that I would cut it. I suppose he knew who was handling that cut of cars. On that kick the train was cut in two only at the one place where Temple fell. It was Melville's duty to cut off that car, and the other brakeman had to look out for it. I do not suppose that it was Melville's duty under the rules and customs to notify them (the other brakemen) that he was going to cut that car. I do not suppose it was his duty to look on top of the cars for anybody there. I have never seen it done. There is no rule or custom that requires a brakeman about to cut a car to investigate the train crew to see if there is anybody about to pass over to another car."

Appellee, after detailing the circumstances under which he received his injuries, further testified as follows:

"That he had no warning that these cars were going to be separated. When Melville told him to go up to Riley's train and tell him that he was going to get the car in front of their engine on the main line as soon as they got through with the work where they were on the south end of the house track and drop three cars in on the Cotton Belt transfer, he understood that the cars between which he fell would not be separated. They had finished with the work on the house track and were kicking the cars up the main line. That if Melville had meant to cut them in two, it would have been as easy for him to have told him (Temple) that the stock car was to be dropped off on the Cotton

Belt transfer as to tell him that it would not. If Melville had done as he told him he was going to do, the proper place to have cut them would have been right in front of the coal car, in which event he would have cut off two cars. Only one car was cut off instead. Melville certainly told him that he expected to separate the two box cars from the three coal cars. That he did not know who cut off the car that was cut off. That he did not have time to look to see where anybody was after he got off of the cars that were kicked over on the house track. That he wheeled around and caught the cars as they passed, and caught the string of cars within one car length of where he wanted to catch. He caught behind where he wanted. It did not take him but · a second then to get to where he wanted to go and where he thought he could go. That it is customary for brakemen to look out for one another, and to keep from hurting one another as much as it is possible to do so. That is the way he always worked. That it is the duty of the swing brakeman, where it is possible, to know where each member of the crew is and what he is doing. Sometimes circumstances alter cases. He might have to go on the other side to pull a pin or a lever might be blocked so that he could not pull it, and he would have to go on the other side. It should be the duty of each member of the train crew to know where the others were and what they were doing. It was the duty of swing brakeman, Melville, to cut the cars where he wanted them to be cut because he was right where he could cut them. As he understood it, it was his duty to cut off the two cars if he did as he told him he was going to do. It was his duty to cut off two cars, according to what he told him he was going to do. If he decided to change his plan of work after he made the statement to him, it was his duty to notify him to look out."

On cross-examination he testified that he was an experienced brakeman; that he did not read the switch list but glanced at it over Melville's shoulder at the time he asked him what it looked like, and received the answer before stated; that it was not Melville's duty to tell him anything about the switch list nor what movements would be made by the train, as the work was done entirely by signals. His purpose in asking Melville what the list looked like was to get an idea as to how long his train would be engaged in switching in this yard. The switching on the house track having been finished when he caught the train and started to the rear car, he supposed that Melville was preparing to place the coal cars on the Cotton Belt track as he had told him he would do. The proper way to have made this movement was to have pushed the train up on the main line, cut off the two rear cars, come back with the train and before the coal cars reached the switch for the Cotton Belt track cut them loose, run by the switch with the balance of the train and then throw the switch so that these cars would run in on the Cotton Belt track. Melville did not tell him that he was going to cut the two rear cars off together. The only reason he had for supposing that these cars would be cut off together was that the switching on the house track being finished, and from the message sent by Melville to the conductor of the other train that after finishing switching on the house track they would have to drop the coal cars on the Cotton Belt track and he would then come up and

remove the car in front of his train, appellee supposed that the next movement would be to drop the coal cars in on the Cotton Belt track in the manner stated before. He further testified:

"I did not know where either one of these two end cars was to be placed. I knew that Melville would have to dispose of those two end cars before he could drop the coal cars in on the house track. He did not necessarily have to dispose of both of them at once. He had a right to put one on track 15 and the other on the main line, if he wished, or he had a right to leave both on either one of these tracks that he wished. After he told me what he did about moving those cars it was his duty to tell me where he intended to put them · (if he changed his plan). I do not know that he ever changed his program, so far as the coal cars were concerned; he had not disposed of them when I got hurt. The other way of handling those cars was the hard way. He had a right to do it the hard way, if he wished, without telling me; a whole lot of them do it." . . .

"Q. Is it the duty of the swing brakeman, when he cuts the cars, to know where every other brakeman is? A. It should be, yes, sir. Q. Was it his duty? A. I have always made it my duty to know where the brakemen were or to know whether they could get to the work or not. Q. If you had been in Melville's place, and had not known where he was, would you have climbed up on the car to see where he was? A. No, sir. Q. You would not have hunted him up? A. No, sir. Q. You would have cut it off? A. I would have cut it off when it came time. Q. Did he cut it off too soon? A. It was too soon for me. Q. Did he cut it off sooner than he ought to? A. I do not know anything about that. Q. He was the judge of when that was to be? A. Yes, sir. Q. Would you have hunted up the rear brakeman? A. No, sir. Q. It was not possible for him to see you on top of the car? A. No, sir; I could not see him either." . . .

"As a general rule it is the duty of the brakemen to know where each other are. To get right down to the absolute facts of the case, I suppose it was as much my duty to know where he was as it was his to know where I was. I suppose it would be the impossible thing for either of us to have known where the other was all the time. He might have kicked me a cut of cars, and they might have rolled on a mile and a half beyond Jacksonville, and they might not have had any brakes on them, and I would have had to follow them up and he would have had to work by himself, and I would have had to hunt him up after I got back. I have been closer to him than that and have not known where he was. I was right there. I did not have time to look up and down the train to see where he was. If he was hanging right where he says he was, he was looking right back towards me. I did not have the time to glance up towards him, or anything else, except the car I was getting on. I did not have time to look after him and did not do so. I did not look for him either way; I thought he was going to cut the cars right where I got on. I did not see him there: I knew that was his place, if he was going to cut them there. I do not know where he was. I guess the train was running ten or twelve miles an hour. He did not have to get on the train on that side; there is a lever on each side of the train. That was the place to do it, provided

he could get there. I was on the south side. I do not know where Melville was. I presume that he was on the south side, but he might have been on the other side." . . .

"If Melville had been rear brakeman on that train, and I had been swing brakeman, and I had told him what he told me, I would not have cut them where he did. If I had been the swing brakeman handling that switch list, with those three coal cars to be placed on the transfer track, I would have kicked those two cars ahead of the coal cars up the main line far enough ahead to make the drop, and then have dropped the coal cars in on the transfer track. The first thing would have been to kick the two cars in front of the coal cars up the main line, and then have followed them up far enough to make the drop, and then have given my engine plenty of room and given the head man plenty of room. That would be a distance of fifteen or twenty feet, to keep from cornering the cars or injuring the switch. Then I would have dropped the coal cars on the transfer track and have come back. That would have saved the extra move of kicking that car on track 15. That is one move he made that he had no business to make according to what he told me. Then, he had to come back up over the switch, throw that switch, come up the main line, cut off the other car, and then make that drop. He had to make three moves the way he did it, where he would not have had to make but two if he had done as I thought he was going to do. Melville said that he was going to get the car away from in front of Riley's engine as soon as he could get through with the work on the house track and get through with the coal cars to be placed on the transfer track."

The foregoing is all of the material evidence in the record bearing upon the issue of negligence, and we agree with appellant that it is insufficient to support the finding of the jury that appellee's injuries was caused by the negligence of his coemployees as alleged in his petition.

The allegations of negligence contained in the petition are as follows: "That while plaintiff was engaged in the faithful, careful and regular performance of his duty, and was in the act of stepping from the top of the next car onto the car on which the brakes were to be set as aforesaid, some other servant or employee of said company, who was then engaged with plaintiff in the operation of said train, negligently and carelessly and wholly without warning to plaintiff, caused said two cars to be suddenly separated and uncoupled, and caused the cars to be suddenly and violently jerked, throwing plaintiff and causing him to fall down upon the track between the cars and rails. . . . That said injuries to plaintiff were caused by the negligence and carelessness of the defendant company and of his coemployees in charge of said train, as above shown, in causing said cars to be separated without notice and to be suddenly and violently jerked when plaintiff was in a position of danger and peril in the due and ordinary performance of his duties as a brakeman and in the exercise of the utmost care, when his injury could and would have been avoided by the exercise by the defendant company and his coemployees of ordinary care. That if the parting of said cars and the sudden jar to same, which caused plaintiff's injury, was not due to the negligence of plaintiff's coemployees in the performance of their duties as joint operators of said train, as

he avers, then he says that same resulted from some defect in said train and its couplings or other appliances, or in the roadbed unknown to him but which was known to the defendant company or could have been known and corrected by the exercise of ordinary care."

Appellee very earnestly contends that the jury might have found from this evidence that Melville was negligent in cutting the car loose and giving the slow down signal to the engineer without first ascertaining appellee's position, and that McWhorter was also guilty of negligence in repeating the slow down signal to the engineer when he knew that the rear car was to be cut loose and that appellee was hurrying to his proper place on said car and that the result of the slowing down of the train would cause said car to separate from the one on which appellee was running. The undisputed evidence shows that Melville in giving the signal and cutting the car loose was pursuing the usual and ordinary method of switching or placing cars in a yard, and it is not contended that there was any negligence in the manner in which the work was performed.

The injury to appellee was due entirely to the fact that just at the time the cars separated he was in the act of stepping from one to the other, and unless Melville could have reasonably anticipated that he would or might be in such position there was no negligence in cutting the car and causing it to separate from the train in the manner shown by the evidence. It may be conceded that appellee should not be held guilty of contributory negligence in attempting to pass from one to the other without first ascertaining whether or not they were about to be separated, and yet, it does not follow that Melville would be guilty of negligence in cutting the cars under the circumstances shown. Appellee doubtless supposed that the two cars would be cut off together, and he may have been led to this belief by the statement of Melville that after he finished the work on the house track he would drop the coal cars on the Cotton Belt, but Melville could not reasonably have anticipated that appellee would have reached this conclusion from the statement made in answer to the question as to what the switch list looked like, nor from the message sent to the conductor of the other train. There is nothing either in the statement or the message to indicate that there was any intention on Melville's part when he finished his work on the house track and got ready to put the coal cars on the Cotton Belt track, that the two cars in the train in the rear of the coal cars would be cut off together. Appellee's belief that the cars would be cut off together is based wholly upon his opinion that this was the easiest and best way to do the work. If Melville could reasonably have anticipated that appellee would conclude from what he had said to him that the two cars would be cut off together, we hardly think in the circumstances shown by the evidence he would have been guilty of negligence in cutting the cars as he did. He was on the car for the purpose of cutting it at the place he did when he passed appellee before the latter got on the train. He had the control of the movement of the train and all the work was done by signals from him. It was the duty of the other members of the crew to watch for such signals. His position on the car when he passed appellee was notice to any one familiar with the work that he was there for the purpose of cutting the

car loose. In these circumstances it was not his duty to inform appellee that he would cut the rear car off to itself, nor to ascertain where appellee was at the instant he drew the coupling pin and caused the cars to separate. There was nothing in the circumstances shown from which he could have reasonably anticipated that appellee would at that instant be in the act of stepping from the one car to the other.

We think it clear that the evidence is also insufficient to charge McWhorter with negligence. He was not required to refrain from giving the slow down signal merely because he saw appellee running along the top of the car toward the rear end of the train. He could not reasonably presume that appellee was ignorant of the fact that the last car in the train was to be cut off and that he would reach the end of the car next to the one to be cut loose just at the time the two cars separated, and fall between them.

The evidence as we view it presents a case in which appellee can not, under the law, be compensated for his great injuries, but they must be charged to the dangers and risks necessarily incident to the great public service in which he was engaged; and for injuries so received no compensation is allowed by law. As much as we may regret this infirmity in our laws, it is not the province of the courts to change them. The following forcible expressions in regard to the duty of the court in cases of this kind are quoted from the opinion of Mr. Justice Marshall of the Supreme Court of Wisconsin, in the case of Clemons v. Ry. Co., 137 Wis., 137:

"Rules of law can not be changed by the court and adapted to the exigencies of particular cases however distressing they may be. With indifference to results, except as seriousness thereof may stimulate greater care, established principles must be applied as the infallible test of what is right and what is wrong in the legal aspect. Whether the law as we find it is as we would have it to be if we were permitted to make it, instead of being mere instrumentalities to apply it, is immaterial. Our responsibility begins when we are invoked for its application. It ends when we apply it as we find it. The grade of fidelity with which that duty is performed is to be measured by the vigor and courage with which we labor in our own special field, leaving the responsibility for changing the law to the department of government in which the Constitution has lodged it."

Our conclusion being that under the undisputed evidence appellant can not be held liable for the injuries sustained by appellee, the assignment of error complaining of the refusal of the court to instruct the jury to return a verdict in favor of defendant must be sustained.

This conclusion renders a discussion of the other assignments of error unnecessary and requires that the judgment of the court below be reversed and judgment here rendered in favor of appellants, and it has been so ordered.

*Reversed and rendered.*

Writ of error refused to appellee.