### FREEMAN v. IRVING.†

(Court of Civil Appeals of Texas. April 8, 1911. Rehearing Denied April 29, 1911.)

1. MASTER AND SERVANT (§ 278*)—INJURY TO SERVANT—NEGLIGENCE OF FELLOW EMPLOYÉS—EVIDENCE.

In an action for injuries to a brakeman who fell between cars when one was cut off from the train, evidence *held* not to show negligence of the railroad company, or its servants, in failing to warn him.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954–972; Dec. Dig. § 278.*]

2. MASTER AND SERVANT (§ 206*)—INJURY TO SERVANT—ASSUMPTION OF RISK.

The risk of injury to a brakeman by falling between cars while engaged in switching, is a risk incident to the service, and the master is not liable for the injury so sustained.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 550; Dec. Dig. § 206.*]

Bookhout, J., dissenting.

Appeal from District Court, Wood County; R. W. Simpson, Judge.

Action by J. F. Irving against Thomas J. Freeman, as receiver of the International & Great Northern Railway Company. From judgment for plaintiff, defendant appeals. Reversed and rendered.

Stafford & Geddie, Andrew West, and J. A. Germany, for appellant. Hart, Hart & Landers, for appellee.

TALBOT, J. Appellee brought this suit against the appellant to recover damages for personal injuries received by appellee on October 23d, 1909, while in the employment of the appellant as the receiver of the International & Great Northern Railway Company, as brakeman on a freight train, alleging that his injuries were caused by the negligence of a fellow employé engaged with appellee in switching or placing a car or cars in the railroad yard at Mineola, Texas.

The allegations of negligence are, in substance: That the switching was being done

under the direction of John Rucker, who handled the car list and designated the cars to be shunted; that I. M. Clayborn was performing the work of head brakeman and was cutting the cars as they were being switched. That both Rucker and Clayborn had their station and work on the ground. That plaintiff was supposed to be on the portion of the train farthest from the engine and on top of the cars. That while the train was temporarily standing, at the request of Clayborn and Rucker, it being daylight, plaintiff took the lanterns of said Clayborn and Rucker to the caboose of the train. That while he was placing the lanterns in the caboose the train was signaled by Rucker and Clayborn to move in the direction it was headed, and that plaintiff after placing the lanterns in the caboose and while the train was in motion, got on top the cars, as was his custom and his duty, in order to reach his station at the extreme end of the train from the engine, which was farthest from the caboose. That he had to pass along a narrow running board and had to step from one car to another, and while the car was in motion and while he was rightfully going to his station at the extreme end of the train from the engine, the train was cut by Clayborn at the direction of Rucker and two or three lead cars were shunted and switched; that when the cars were cut, the engine slackened its speed just as plaintiff was in the act of stepping from one car to another, and caused him to fall to the ground and be injured. He further alleges that Rucker and Clayborn should have known, and, in the exercise of reasonable care, could have known, of his position, and did know that the act of cutting the train without notifying him and without keeping a lookout for his peril, might reasonably be expected to result in his falling and his consequent injury. That they knew he was ignorant of the fact that the cars were to be cut and knew of his perilous position; that they failed to notify him and that his injury was a direct result of their failure to exercise ordinary care. The defendant answered by general demurrer and general denial and plea of assumed risk and contributory negligence, alleging that the train was handled in the regular and customary manner of handling such trains and he therefore assumed the risk of cutting same, etc.

[1] As we have reached the conclusion that the evidence is insufficient to show liability on the part of appellant for the unfortunate accident, which resulted in serious injury to appellee, we will give the material testimony of the witnesses in their own language.

I. M. Clayborn testified: "I am a freight brakeman on the International & Great Northern Railroad. I am familiar with the rules and customs governing brakemen in the handling of trains. I remember the circumstance of Irving falling off of a car and getting hurt at Mineola last fall. I was at that time what they call the 'head brake-man,' and was following the engineer. Irving, I believe, was rear brakeman at that time. I made a cut of the train that morning at the time Irving fell. I am not positive about the number of cars we cut from the engine. I made that cut that morning with the coupling lever. When I made the cut, I gave the engineer a stop signal. I lifted the pin with one hand and made the stop signal with the other hand. If a man had been passing over that train, he could have seen me in two ways—by stopping at the end of the car and looking down between, or even off 'the edge of the car. In switching cars about the yard in Mineola, I should think each man would look out for himself. I don't see that I had any particular duty of informing anybody what I was going to do. I did not know that Irving was on top of that train when I cut it in two there. I considered it was my duty to cut the train at that place at that time, on account of knowing where the cars were going, in placing the T. & P. yard. It was not necessarily any part of my duty to know where he was at that time, as long as I did not think that he might be under the train or was in a perilous position. I had no idea he was in a perilous position. It did not at all occur to me, from my knowledge of the conduct of the duties of the brakeman, from my knowledge of operating trains, nor would I have reasonably supposed or had any idea he would be in danger; I supposed he was in the caboose. I saw him go into the caboose. Q. Now I will ask you, what is the customary way and the custom among brakemen in passing down the top of trains, with reference to looking between the train to see whether it is to be cut when switching? A. Generally stop; just look between the cars; generally look on the side of the car where the men are working. When Irving fell, I was standing at the side of the track, right about four feet of where he fell, I judge. In switching and making cuts, we make the cut and let the men whose duty it is take care of their place. It might be they would be off some place out of reach, or something like that; it is owing to the condition of the lay of the track, and so on, as to our duty and the custom with regard to that matter. It was not necessarily part of my duty to tell Irving when and where I was going to cut that train. It was not customary to do so at that time. I did not apprehend any danger that Irving would step off between those cars that morning when I cut the train."

On cross-examination he said: "Irving's duties that morning called him to the rear of the train, acting as rear brakeman. I consider he was in the proper discharge of his duties at the time he went to the caboose; he was going to the proper place on the train; that is, the heading he was making. Of course, if I knew it would endanger Irving's life, I would consider it my duty to

notify him when and where I was going to cut the train. Q. If the train were moving, would it be proper to be on top of the train, or would it be proper to be on the side, running down to the other end? A. It would be proper to be on the train, I suppose; it might be going faster than he could walk. I believe that is the way the hind brakemen are placed on the I. & G. N. Railroad (that is, to look after the lanterns). It is customary for the hind brakeman to look after the lamps and take charge of them."

George H. Sewell testified: "I am a conductor for the International & Great Northern R. R. and have been in the railroad business since 1889. * * * I am familiar with the rules and customs governing the operation of trains and the duties of the brakeman in the operation of the train. Each brakeman is supposed to perform his own work and look out for himself in the operation of car cutting and switching of cars, etc. It is not customary for one brakeman to look out for the whereabouts of another before he cuts the car, or for him to go and look to see whether anybody is on top of the car, or anything of that sort; each man is supposed to look out for his own safety. If I had been Mr. Irving that morning in going over the train (they were switching and moving the cars he was going over), I would have looked down in between the cars. A man passing over the top of the train, when he gets to the end of the car, he can see if the cars have been cut before he steps, if he will look down. If the cut has been made, if the pin had been pulled, a man looking down the end of the car could tell if it was separated or not. The caboose was next to the engine that morning. We had six cars—counting the caboose is seven—in the train; we had a merchandise car we carried next to the engine, then the caboose and two house cars, and some deliveries for the Texas & Pacific. It is not customary for each brakeman to know what disposition is to be made of the car; only the switchman knows; sometimes they tell one another and know, but the switchman handles the list, and they all work by signals. It is the duty of the rear brakeman to look after the lamps; that was the duty of plaintiff on this occasion. Plaintiff going to put up the lantern, and Clayborn knowing it, it would not have been Clayborn's duty necessarily, to have notified plaintiff this cut would be made. A man works by signals. If it had been me I would have been watching out, I would have looked down for my own safety. I would have stopped at each car and looked down before stepping; that is the way it is usually done."

J. J. Rucker testified: "I am familiar with the rules and customs governing the switching of trains and the conduct of brakemen in handling trains. Plaintiff was supposed to be on the rear end of the train. I was switching at the time he was injured.

The head brakeman is supposed to attend to the switches and do as the swing brakeman instructs him, and the rear brakeman is supposed to look after the cars and do as he is instructed. They do not always necessarily tell us when they are going to make a cut of cars; they are not supposed to tell you when they cut a car in switching. I am supposed to look after my duties and my own particular part of the work without any instructions about it. I have acted as rear brakeman some. In switching, if the rear brakeman is going to his position on the rear of the train, all the other brakemen are not supposed to look out for him before they make a cut; he is supposed to look out for himself. It is owing to what is on the list as to how those cuts are made; if there is any cut to be on the lead or transfer, they cut them on the lead or transfer. The rear brakeman is supposed to be on the rear cars and look out for them. It is customary, when going down the top of a train, to look out in passing between cars, to see whether there are going to be cuts made, when you are switching your train; I generally always do. It is understood by railroad men, when a train is being switched, that it is for the purpose of separating the train, and cutting out and adding to it. I did not notify Irving it was to be done. Taking the circumstances of this case, Irving being away, he going over the train to make the cut right away, it would not have been customary for Clayborn to have notified Irving; nobody notified me that way. Clayborn's place was along about where he was. He was in his proper place; I suppose about two or three cars from the engine. It was his place to be about the middle of the train somewhere where he could get signals from me. A brakeman down by the side of the train could have seen plaintiff if he was on top of the train up there. It is not customary for them to run out on the right of way and look for a man. Q. I believe you say you generally went from the front to the back and the plaintiff that morning could have gone and likely would have gone that way, but in doing that I will ask you if it is not a fact or whether or not it is a fact that in going back there he takes the chance of the train being cut while he is going? A. Yes, sir."

Plaintiff testified: "I have worked for Thomas J. Freeman, as receiver of the I. & G. N. R. R. Co.; commenced on the 15th day of January two years ago, and quit when I got hurt, October 23, 1909. Clayborn handed me his lantern and saw me go to the caboose, well knowing that I did not know that the train was to be cut there; that while I was in the caboose he knew I would not get on the ground and try to outrun the train; it is not customary or the rule. I came on top of the cars, not knowing that there would be a cut made. They did not tell me, and I did not know, not being with

them at the time. They knew what they were going to do. They did not tell me, and I went on top, intending to go to my position. They should not have started till they had a man on the rear end of the train to protect against crossings. I started to the rear end of the train to protect these cars, and while I was starting to cross from the second to the third car from the caboose the cut was made, and I lost my balance * * * and fell, and so forth. We had three lanterns; they belonged to Rucker, Clayborn, and myself. Clayborn handed his to me, and Rucker's was setting on the caboose platform. He knew I was going over the cars. * * * I remained in the caboose to put up the lamps. The train had started before I got on top of the cars."

On cross-examination he said: "I worked for the railroad company about six years, nearly that time. We had six or seven cars. The engine was backing up; it was going west; the caboose was next to the engine. I was rear brakeman; my duty was to be on the back end of the train to protect against crossings and cars from getting away. It is a custom and rule among brakemen and crews in working freight trains that each man is supposed to look out for his own position as long as they don't endanger one another's lives; we work principally by signals. You cannot get on top in the middle of the car and see a man by the side of it. You could see at the end of it, if he had been standing at the end of it. He cut the cars, and as I went to step I.was not looking to see where he was. I was looking to be sure of my footing, so I would not step between the cars. Just as I went to make the step, the cars rolled. Clayborn is bound to have made the cut just in time to give them room to roll. I could not say when he made the cut. I know as I went to step the cars rolled away, so I could not reach them; but I suppose he made the cut about the time I got to the end of the car, just in time for them to roll away. It is not customary to tell the other brakemen where we are going, unless we endanger one another. The brakeman is supposed to run out from the car and look to see whether or not there is anybody up there, if he is going to endanger another man's life. He was endangering a man's life, because this man knew I was coming on top. He knew I would get to the end of the car as soon as possible, and he knew I was not going to get on the ground to outrun the cars. I did not tell him, but he had railroaded long enough to know it. I did not tell him, because I knew it was not my duty, and I did not know he was going to make the cut. I think he ought to have told me; going to endanger my life, he should have told me. I was not supposed to know where those cars were going; but it was where we were headed for. I was supposed to get on the rear end of the train to protect those cars. I did not ask where the cars were to

be carried; I made the statement shown me by counsel. When we endanger one another's life, we are supposed to tell one another, or when we are going to make a cut or switch, or anything where one is liable to get hurt; if we tell one another what we are going to do, we are supposed to know when any one gets in danger; supposed to know where each other are. I could not have supposed they were going to the house track, but from all appearance they started that way. Q. I will ask you if you did not make this statement: 'It was not my duty to know it; I did not know we had cars for T. &. P. delivery; it was not my duty to know it, because it is the switchman's duty to make the cut, and unless he tells you don't know when cuts are to be made.' A. That is a fact, unless we know we are going to endanger each other. Q. 'I did not tell brakeman Clayborn I was going on top of the cars. It was not my duty to tell him?' A. 'No, sir; I did not tell him, for it was not my duty. I never knew he was going to endanger my life, and he did.' I made this statement: 'I do not blame any one for my injuries, because it was accidental purely.' I knew there would be a general shifting around of those cars; but I knew they were going to work the house before there would be a general shifting. When brakemen make a cut, they have different things they do then. We work by signals; they give different signals; sometimes they stop and sometimes they go ahead. If they want to stop, they give stop signals."

This evidence, in our opinion, was insufficient to warrant a finding by the jury that plaintiff's injuries were caused by the negligence of his coemployés, as alleged in his petition, and therefore defendant's special charge, directing the jury to return a verdict in its favor should have been given. That the plaintiff knew, or should have known, that in doing the work in which he and his co-workers were engaged on the morning he received his injuries, cars would be separated in the manner those were, between which he fell, is beyond controversy. He was an experienced brakeman and perfectly familiar with the nature of switchwork. To him "switching" must have meant the incorporation of other cars into the train on which he was at work, or the taking of a car or cars from that train and placing in another train, or on a side track, and that this was done, ordinarily, by the cutting and separation of cars, as shown by the evidence. He alleges that he and his coemployés were, on the morning he was hurt, working to a common purpose, to wit, switching and operating a train of cars in the yards at Mineola; that "the switching was being done under the direction of John Rucker, who handled the car list and designated the cars to be shunted, and that I. M. Clayborn was performing the work of head brakeman, and was cutting the cars as they were being

switched." It is true plaintiff testified, "I came on top of the cars, not knowing there would be a cut made," but this statement was made in connection with and immediately following one made by him, to the effect that "Mr. Clayborn handed me his lantern and saw me go to the caboose, well knowing I did not know the train was to be cut *there*" (italics ours), and in connection with the further statement, "They did not tell me, and I did not know." We ·do not think it can reasonably be said that this testimony, in view of plaintiff's allegations, his experience, and his knowledge. of what the term "switching of cars" signified to him, raised an issue of negligence on the part of the defendant in failing to notify plaintiff before the cars in question were separated that they were going to be separated. Besides the evidence shows that it was not the duty of any of defendant's servants to notify him that the cars were going to be cut and separated.

[2] Nor can it be said that plaintiff's co-employés were negligent in cutting and causing the cars to be separated without first ascertaining the plaintiff's position on the train. There is no claim or pretense whatever that there was any negligence in the manner in which the work of cutting and separating cars was performed. On the contrary, the evidence conclusively shows that the usual and ordinary method of switching and placing cars in the yard was pursued, and that plaintiff's presence on the car from which he attempted to step when the separation of the cars occurred was unknown to Clayborn; and there is nothing in the circumstances shown from which Clayborn could have reasonably anticipated that just at the time the cars separated plaintiff would be in the act of stepping from the one to the other. This being true, there was no negligence in uncoupling the cars and causing them to separate as was done. The work of switching the cars was done by signals, and it was the duty of plaintiff, as well as the other members of the crew, to keep a lookout for signals. The usual signals were given on the occasion in question, and were of a character to inform plaintiff, had he been looking and seen them, that the cars were going to be, or had been, separated. It was not the duty of either of his coemployés to inform plaintiff that the separation was about to be made, "nor to ascertain where he was at the instant he drew the coupling pin and caused the cars to separate." It is clear that plaintiff's injuries must be attributed solely to the coincidence of his attempt to step from one car to· the other, and the separation of the cars at that particular moment, and not to any negligence of the defendant or its servants. It is therefore a case in which the plaintiff's injuries must be charged to the dangers and risk necessarily incident to the service in which he was engaged, and for which the defendant cannot be held li-

able. International & Great Northern Ry. Co. v. Temple, 130 S. W. 850; Cardwell v. Railway Co., 40 Tex. Civ. App. 67, 88 S. W. 422.

The judgment of the lower court ·must therefore be reversed, and judgment here rendered for the appellant, and it is so ordered.

Reversed and rendered.

BOOKHOUT, J. I regret I cannot concur in the holding by the majority of the court that the evidence is insufficient to show negligence on the part of appellant. The plaintiff testified: "Clayborn handed me his lantern and saw me go to the caboose well knowing that I did not know that the train was to be cut there. I came on top of the cars not knowing that there would be a cut made. They did not tell me and I did not know, not being with them at the time. They knew what they were going to do. They did not tell me and I went on top intending to go to my position. They should not have started till they had a man on the rear end of the train to protect against crossings. I started to the rear end of the train to protect these cars and while I was starting to cross from the second to the third car from the caboose the cut was made and I lost my balance and fell. He (Clayborn) knew I was going over. the cars." Clayborn testified: "If I knew it would· endanger Irving's life I would consider it my duty to notify him I was going to cut the train." The evidence was sufficient to raise the issue of negligence on the part of defendant.

If Irving did not know a cut was to be made of the cars and Clayborn knew that Irving did not know a cut was to be made, and further knew that Irving intended to· pass over the cars, or could have reasonably· anticipated that he would pass over them, in returning to his proper position at the rear· of the train, then it was his duty to notify Irving of the intended cut and his failure· to do so was . negligence. Under the evidence, in my opinion, the court was not· authorized to give a charge instructing a verdict for defendant.

The case of Railway Co. v. Temple, cited· and relied upon in the opinion of the court, is distinguishable on the facts. There, Temple, the rear brakeman, had been shown· the switching list and knew that the train· was to be cut and certain cars dropped.

I am of the opinion that error is pointed· out in the fourth assignment wherein it is contended the court erred in refusing defendant's special charge No. 6, reading as· follows: "Unless you find from the evidence· I. M. Clayborn was guilty of negligence in making the cut at the time and place he· did, then you will find for defendant." The· refusal of this charge, in my opinion, was error, which entitles appellant to a reversal of· the judgment. I do not concur in the rendi- · tion of judgment in favor of appellant.